NO. 12-03-00247-CV
 
IN THE COURT OF APPEALS

TWELFTH COURT OF APPEALS DISTRICT

TYLER, TEXAS
VANCE WALTERS,                                          §                 APPEAL FROM THE 87TH
APPELLANT
 
V.                                                                         §                 JUDICIAL DISTRICT COURT OF

KENNETH LADOYTT NORTHCUTT,
APPELLEE                                                        §                 ANDERSON COUNTY, TEXAS
                                                                                                                                                            
MEMORANDUM OPINION
            In four issues, Appellant Vance Walters challenges the trial court’s judgment awarding
Appellee Kenneth Ladoytt Northcutt $28,345.77 in damages for the conversion of cattle. We reverse
and remand.
 
Background
            In June of 2000, Walters and Northcutt agreed to share the profits from the raising and selling
of cattle. The agreement called for Northcutt to purchase the cattle with funds to be borrowed from 
the Comanche National Bank. The cattle would serve as collateral for the loan. Once Northcutt
purchased the cattle, he was to deliver them to Walters, and Walters would be responsible for
feeding and caring for the cattle. When the cattle were sold, the proceeds from the sale would first
go toward paying off the loan at Comanche National Bank. Walters and Northcutt agreed that after
the loan was paid and any other expenses deducted, they would equally divide any net profit.
Although Walters was charged with keeping the cattle, Northcutt retained ownership of the cattle
as well as control over their sale. Walters would also be reimbursed for all of the expenses in
maintaining the cattle; however, Walters believed that he would be compensated for processing the
cattle on a per-head basis. Northcutt denied that the agreement called for Walters to be compensated
in that manner. 
            At some time between June and August of 2000, Northcutt purchased and delivered the cattle
to Walters. Walters maintained that Northcutt delivered 298 cows, 17 bulls, 4 calves, and 78
yearlings to his property in Cayuga, Texas. Northcutt, however, argued that he delivered 324 cows,
17 bulls, and 86 yearling calves to Northcutt. On November 7, Northcutt purchased an additional
26 yearling calves and delivered them to Walters. 
            From November of 2000 through November of 2001, Northcutt traveled to Walters’s farm
and picked up a number of the cattle in order to sell them. In late October or early November,
Northcutt complained to Walters that all of the cattle could not be accounted for and demanded that
Walters turn over the remaining cattle to him. Northcutt also refused to reimburse Walters for the
expenses he incurred in caring for the cattle. Walters contended that Northcutt had picked up all of
the cattle that had been delivered to his farm, except for the cattle that died.
            On February 25, 2002, Northcutt sued Walters, alleging that Walters converted the cattle. 
He also alleged that Walters was negligent in the conversion of the cattle because he “knew or
should have known that the cattle which he converted” were Northcutt’s property. Northcutt further
asserted that he was seeking punitive damages because Walters allegedly acted with malice. 
            Walters generally denied Northcutt’s suit on April 16, 2002 and filed a counterclaim on
October 3. In the counterclaim, Walters alleged that Northcutt 1) failed to make payments on a
sworn account, 2) wrongfully converted his property, and 3) breached a contract. He also sought
damages for lost expenses in caring for the cattle under the theory of quantum meruit and attorney’s
fees for prosecuting his claims. Northcutt filed an amended answer to Walters’s counterclaim on
February 12, 2003, with a verified denial that disputed Walters’s suit on sworn account. The case
was tried to the court on February 13. On April 25, the court rendered judgment in favor of
Northcutt for 1) $28, 345.77 in monetary damages, 2) $1,901.85 in pre-judgment interest, and 3)
post-judgment interest at the rate of 10% per year from the date of judgment until paid. Walters
requested written findings of fact and conclusions of law on May 13. On May 15, the trial court
found that Northcutt 
 
 . . . proved through corroborated testimony and demonstrative evidence that he purchased and
delivered 324 cows, 17 bulls and 112 yearlings to [Walters] during the year of 2000. When
[Northcutt] decided to sell the cattle, he was limited by [Walters] who exercised control over the
property cattle and was only permitted to retrieve 243 cows, 11 bulls and 57 yearlings. [Walters]
converted 114 head of [Northcutt’s] cattle between November and December 2001. [Northcutt]
established the fair market value of the cattle at the time and place of the conversion of the cattle based
on the sales price of the cattle.


            Based on the testimony, the trial court found that “[a]s of November, 2001, [Walters] retained
possession of 81 cows, 4 bulls and 55 yearlings, minus the cattle and yearlings that died.” The trial
court also found that 1) Walters sold the cattle and retained the entire amount of the proceeds, 2) the
evidence established a profit-sharing agreement between the parties, 3) Walters should take nothing
on his counterclaims, 4) no agreement to reimburse Walters for the expenses in caring for the cattle
existed, and 5) no evidence supported an award of punitive damages against Northcutt. In its finding
regarding the agreement between Northcutt and Walters, the court specifically found that 
 
[a] preponderance of the evidence established the parties had an agreement whereby [Northcutt] would
provide the cattle and the financing of the same and [Walters] would provide the grazing and labor. 
When the cattle were sold, the expenses including the payment of interest [for the cost of the loan to
purchase the cattle] would be deducted from the gross proceeds and the profits would be split evenly. 
The Court found [Walters’s] testimony that he was to be paid an additional amount (.50) per day per
head of cattle for grazing unconvincing. 


            In its conclusions of law, the trial court found that Northcutt established by a preponderance
of the evidence that Walters converted the cattle in question when Northcutt proved 
 
. . . all three prongs to establish [Walters] converted his cattle. First, [Northcutt] owned the cattle in
question and was entitled to possession of his property. Second, [Walters] exercised control over
[Northcutt’s] cattle to the exclusion of and inconsistent with [Northcutt’s] rights. The second prong
occurred when [Walters] refused to return [Northcutt’s] cattle as requested. Last, [Northcutt]
demanded that he be allowed to retrieve his cattle, and [Walters] refused his request. 


The trial court found against Northcutt on his claim for negligence. 
            With regard to damages, the court found that 
 
[s]ufficient evidence was adduced to establish the fair market value of the cattle converted was
$65,900.00. The Court had no means to calculate nor was evidence presented from which a
determination could be made about the number of calves born to cows during the applicable time
period and their value, if any. Thus, no value was added for the converted calves, if any. After
deduction of allowable expenses of [Walters] (not including the asserted .50 per head per day for
grazing which the Court found was not part of the agreement) the gross profit is $56,691.54. One-half
of the profit is $28,345.77. Accordingly, Northcutt was awarded $28,345.77 plus pre-judgement [sic]
and post judgment interest. The Court awarded damages in the amount of $28,345.77 to [Northcutt]
on his conversion cause of action. 


            On June 10, Walters perfected his appeal by filing a notice of appeal. He now raises four
issues for review.
 
Did the Trial Court Err by Allowing an Amended Pleading?
            Walters contends that his counterclaim was for damages resulting from Northcutt’s failure
to pay a sworn account. Under Texas Rules of Civil Procedure 185 and 93, an answer to a suit on
a sworn account requires a verified denial. See Tex. R. Civ. P. 185, 93. Northcutt filed a verified
denial on February 12, the day before the trial began. At the beginning of the trial, Walters moved
for a default judgment on his counterclaim for the amount due under a sworn account because
Northcutt did not timely file a verified denial at least seven days before the trial began. The trial
court responded by giving Walters’s counsel a choice between 1) proceeding with the trial and
allowing Northcutt to present evidence against the counterclaim or 2) granting Walters a continuance
in order to review discovery to properly present his counterclaim. Walters decided to proceed with
the trial. 
            In his first issue, Walters contends that the trial court erred in allowing Northcutt to amend
his pleadings on the eve of trial.


 Northcutt argues that the trial court properly exercised its
discretion by allowing him to amend his answer.
 
Applicable Law
            Rule 63 of the Texas Rules of Civil Procedure allows parties to amend their pleadings at any
time unless the amendment will operate as a surprise to the opposite party; however, any pleadings
offered for filing within seven days of trial shall be filed only after leave of court is obtained.


 Tex.
R. Civ. P. 63. Leave of court shall be granted by the judge unless there is a showing that the filing
will operate as a surprise to the opposite party. Id. In the instances in which leave of the court is
required, the court still has no discretion to refuse such an amendment or supplemental pleading
unless 1) the opposing party presents evidence of surprise or prejudice or 2) the amendment asserts
a new cause of action or defense and thus is prejudicial on its face and the opposing party objects
to the amendment or supplemental pleading. Greenhalgh v. Service Lloyd’s Ins. Co., 787 S.W.2d 
938, 939 (Tex. 1990). When reviewing a trial court’s determination of motions to amend under Rule
63, the analysis focuses on whether the proposed amendment or supplemental pleading is more in
the nature of a procedural change (under which the party resisting the amendment maintains the
burden to show evidence of surprise or prejudice) or a substantive change (which would alter the
nature of the trial itself and which the trial judge retains discretion to deny). Chapin & Chapin, Inc.
v. Texas Sand & Gravel Co., Inc., 844 S.W.2d 664, 665 (Tex. 1992). The trial court’s ruling will
not be disturbed unless the complaining party clearly shows an abuse of discretion. See Bekins
Moving & Storage Co. v. Williams, 947 S.W.2d 568, 573 (Tex. App.–Texarkana 1997, no pet.). 
 Analysis
            Northcutt’s amended answer contained a verified denial, which is a procedural change, not
a substantive change. See Chapin, 844 S.W.2d at 665 (refusal to allow defendant to amend pleading
to add a verified denial, a procedural change, was an abuse of discretion). Therefore, Walters had
the burden to prove surprise or prejudice by the filing of the verified denial. Walters did not prove
to the trial court any surprise or prejudice; in fact, he chose to proceed with trial when he could have
chosen to continue the trial at a later date. The trial court did not abuse its discretion by allowing
Northcutt to amend his pleading to include a verified denial. Walters’s first issue is overruled.
 
Was Evidence Not Timely Produced in Discovery Erroneously Admitted?
            Northcutt filed his original petition on February 25, 2002. Walters allegedly served Northcutt
with discovery (interrogatories, requests for production, and requests for disclosure) on September
23. Although the clerk’s record does not contain any of these discovery requests, Northcutt admits
that he did not respond to any of Walters’s discovery requests until February 10, 2003, three days
before trial began. 
            At trial, after Walters informed the court that his discovery requests were answered three days
before trial, the court gave Walters the choice between 1) proceeding with the trial and allowing
Northcutt to present evidence against the counterclaim or 2) granting Walters a continuance in order
to review discovery to properly present his counterclaim.


 Walters decided to proceed with the trial. 
            In his second issue, Walters contends that the trial court erred by admitting all documentary
evidence and allowing all of Northcutt’s witnesses (except Northcutt) to testify because the evidence
and witnesses were not timely disclosed. Northcutt counters by arguing that the trial court did not
abuse its discretion by refusing to exclude his evidence and witnesses.
            We first note that before Northcutt called his first witness to testify, Walters made a running
objection to each of the witnesses testifying because they were not timely disclosed. The trial court
granted Walters a running objection to each witness Northcutt called to testify and then overruled
the objection. Therefore, any alleged error by allowing the witnesses to testify was properly
preserved. However, with regard to the documentary evidence, Walters globally argues that “every
item of documentary evidence admitted into evidence by the trial court was admitted in error” but
does not specifically identify which documents were erroneously admitted. A party asserting error
on appeal bears the burden of showing that the record supports the contention raised and of
specifying the place in the record where matters upon which he or she relies or complains of are
shown. Sisters of Charity of the Incarnate Word v. Gobert, 992 S.W.2d 25, 31 (Tex. App.–
Houston [1st Dist.] 1997, no pet.). Where this burden is not carried, the party waives the issue. Id. 
Because Walters does not specifically point to where in the record the documentary evidence was
erroneously admitted, he has waived this part of his second issue. See Harkins v. Dever Nursing
Home, 999 S.W.2d 571, 573 (Tex. App.–Houston [14th Dist.] 1999, no pet.) (stating that "[i]t is not
the duty of an appellate court to seine the record in order to discover, if possible, error by the trial
court; it is the duty of an appellant to distinctly point out the alleged errors and where they can be
found in the record.”)
            We also note that because there is no evidence in the record that Walters properly requested
information concerning evidence of fact witnesses, we cannot conclude that Northcutt was under an
obligation to produce it. See Kawasaki Motors Corp., U.S.A. v. Thompson, 872 S.W.2d 221, 224
(Tex. 1994) (indicating that if there is no proper request for discovery, there is no corresponding duty
to respond); City of Paris v. McDowell, 79 S.W.3d 601, 606 (Tex. App.–Texarkana 2002, pet. ref'd)
(noting that because there was nothing in the record to indicate the evidence admitted was ever
specifically requested through discovery, there was arguably no duty to supplement). Moreover, the
trial court could have allowed Northcutt to admit the evidence if it found there was good cause for
his failure to respond or that the failure would not unfairly surprise or prejudice Walters. See Tex.
R. Civ. P. 193.6(a)(1)-(2).
            Finally, Walters fails to demonstrate how he was prejudiced by the trial court's actions. The
trial court gave Walters the opportunity to continue the trial to allow him time to review the 
information he claimed he was not timely provided. In effect, the trial court granted the same relief
available under Rule 193.6(c) had Northcutt not been able to carry his burden under Rule 193.6(b),
that is, a postponement to allow a timely response to the discovery and to allow Walters to conduct
discovery on any new information presented by the response. See Tex. R. Civ. P. 193.6(b), (c).
Walters declined the offer to continue the proceedings, insisting on going forward. He can hardly
be heard to argue that he was unfairly prejudiced. See Santos v. Comm’n for Lawyer Discipline,
140 S.W.3d 397, 404 (Tex. App.–Houston [14th Dist.] 2004, no pet.) (holding that no prejudice
existed where party refused continuance offered by trial court). We overrule Walters’s second issue.
 
Legal and Factual Sufficiency of the Evidence
            In his third issue, Walters argues that 1) there was no evidence to support the trial court’s
findings that a conversion of Northcutt’s property had occurred and 2) there was factually
insufficient evidence to support the trial court’s finding that “[a]s of November, 2001, [Walters]
retained possession of 81 cows, 4 bulls, 55 yearlings, minus the cattle and yearlings which died.”
Northcutt contends that the trial court correctly found that Walters retained possession of 81 cows,
4 bulls, and 55 yearlings.
Standards of Review: Legal and Factual Sufficiency
            A trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence
by the same standards that are applied in reviewing the legal and factual sufficiency of the evidence
to support a jury verdict. Anderson v. City of Seven Points, 806 S.W.2d 791, 794 (Tex. 1991). The
standards for review of legal and factual sufficiency are well established. A party attempting to
overcome an adverse fact finding as a matter of law must surmount two hurdles. Id. First, the record
must be examined for evidence that supports the finding, while ignoring all evidence to the contrary. 
Second, if there is no evidence to support the finding, the entire record must then be examined to see
if the contrary proposition is established as a matter of law. Sterner v. Marathon Oil Co., 767
S.W.2d 686, 690 (Tex. 1989). “Therefore, we are to inquire only whether any evidence was
presented at trial that tends to support the trial court's finding.” Id. (emphasis in original). 
            When we review an "insufficient evidence" or factual sufficiency challenge, we consider,
weigh, and examine all of the evidence, whether it supports or contradicts the trial court's finding. 
Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989). Findings of fact are the
exclusive province of the factfinder. Bellefonte Underwriters Ins. Co. v. Brown, 704 S.W.2d 742,
744 (Tex. 1986). This court is not a factfinder and may not pass on the credibility of the witnesses
or substitute its judgment for that of the trier of fact, even if a different conclusion could be reached
on the evidence. See Herbert v. Herbert, 754 S.W.2d 141, 144 (Tex. 1988); Clancy v. Zale Corp.,
705 S.W.2d 820, 826 (Tex. App.–Dallas 1986, writ ref’d n.r.e.). When a party without the burden
of proof on an issue challenges the factual sufficiency of the evidence, the question is whether the
evidence in support of the complained-of finding is insufficient. Gooch v. Am. Sling Co., 902
S.W.2d 181, 184 (Tex. App.–Fort Worth 1995, no writ). An assertion that the evidence is
"insufficient" to support a fact finding means that the evidence supporting the finding is so weak or
the evidence to the contrary is so overwhelming that the finding should be set aside and a new trial
ordered. Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965). 
 
The Evidence
            Walters stated that he met Northcutt in May of 2000 and had never had any prior dealings
with him. When they entered into the profit-sharing agreement, the agreement was made on a
handshake and no paperwork was drawn up to formalize the agreement. Walters believed that the
arrangement called for him to receive a per-head charge each month for the maintenance of the
cattle. Walters testified that on June 6, 2000, 298 cows, 17 bulls, and 78 yearling calves were
delivered to his property. His records showed that between June 6, 2000 and August 15, 2000,
Northcutt brought 298 cows, 17 bulls, 4 calves, and “78 yearling-type” calves to his property. When
the cattle were delivered, Northcutt paid him $11,000.00 for some of the expenses related to
processing the cattle. To the best of his recollection, Walters believed that the dispute began when
Northcutt picked up all of the cattle and refused to pay him. 
            In November of 2000, Walters sold Ted Conrady 101 head of the original batch of cattle and
10 calves for $650 per head, or a total of $65,000.00. Northcutt did not share any of these proceeds
with Walters. Walters stated that he never sold any other cattle owned by Northcutt. Fifteen cows
died of natural causes. At some point, Northcutt picked up 67 yearlings, and on November 26, 2001,
Northcutt picked up 5 bulls. 
            Jason Latham testified that he helped Walters work and take care of the cattle on his property. 
He was present when 298 of Northcutt’s cattle were delivered to Walters. He stated that Walters
sold 100 of those cattle and gave the proceeds to Northcutt. One bull was killed by the Anderson
County Sheriff’s Department, and 15 head of cattle died while on the farm. Ten or eleven calves
died at birth, and the rest of the cattle were picked up by Northcutt. He also remembered Walters
selling 101 of his own cattle, not Northcutt’s, to Justin Thompson in 2002. 
            Lana Walters, Walters’s wife, testified that she was not present during every delivery of the
cattle to their farm. She also stated that neither she nor her husband, nor anyone else in their
operation, sold Northcutt’s cattle to someone else. From June of 2000 to November of 2001, Mrs.
Walters estimated that about 1,000 to 1,100 cattle were on their property. 
            Rex Womack, an employee of the Lufkin Livestock Exchange, testified that he hauled several
loads of cattle to and from Walters’s property. When he removed the cattle, he took them to Lufkin
Livestock to be sold. A bill of sale from Lufkin Livestock shows that he brought in 136 cows from
Walters’s farm to be sold. After he removed those cows, he estimated that there were 80 to 90 head
of Northcutt’s cattle left on Walters’s farm. Other than that those cattle, he could not remember a
specific number of cattle he hauled from Walters’s farm to Lufkin Livestock. On cross-examination,
he stated that someone else could have taken loads of Northcutt’s cattle from Walters’s farm to
Lufkin Livestock. 
            Rory Lowry, another Lufkin Livestock Exchange employee, stated that in November of 2000,
he delivered a load of Northcutt’s cattle to Walters’s farm. The load contained 10 cows that were
purchased at Lufkin Livestock. As he delivered the cattle, Northcutt was also delivering a load of
25 to 30 yearlings. 
            Virgil Roberts, Northcutt’s son-in-law, stated that Northcutt had 300 to 350 cows on
Walters’s farm. Northcutt also had over 100 yearling calves on Walters’s farm. He testified that
around October 14, 2001, he hauled “ten or twelve grown cows, couple of them [sic] pair cows and
. . . seven, eight, ten calves” from Walters’s property to be sold at Lufkin Livestock. He also
thought that “a bull or two was on there.” An unloading slip from Lufkin Livestock shows that
on October 15, thirty cattle were sold at Lufkin Livestock, and Roberts stated that these were the
cows that he hauled from Walters’s farm on October 14. To the best of his knowledge, Northcutt
did not haul any other cattle to Walters’s farm after that date. When asked about the cattle that
remained on Walters’s property after he picked up the load on October 14, Roberts said,
 
Vance said there was some got by him, the reason he didn’t get them all penned. He said that–that,
you know, he’d–next–next time he had a chance or we need them, that he’d get them penned. And
you could see several head out there. Vance thought there may have been seventy cows left,
seventy-five, something like that, and some yearlings, you know, thirty, forty, fifty yearlings, I don’t
know exact. Vance said there was a good many cattle left out there. 
 
 
            Northcutt testified that he had owned Lufkin Livestock since 2000 and he had been in the
cattle business all of his life. He thought that the agreement he entered into with Walters called
for him to borrow money to buy the cattle, with Walters pasturing and taking care of the cattle. 
After the cattle were sold, the expenses would be taken out of those profits and the net profits
would be split “fifty-fifty.” Northcutt said that he had not agreed to pay Walters a per-head charge
per day for the cattle because that would be “double-dipping.” 
            Northcutt stated that 324 cows and 17 bulls, a total of 341 head of cattle, were initially
purchased. About every two to three weeks, Northcutt would ride around Walters’s farm and check
on the cattle. According to Northcutt, one bull was killed by the Anderson County Sheriff’s
Department, leaving a total of 340 cows. The total amount spent on the cattle was $141,858.43, for
an average purchase price of $417.23 per head.
            He further testified that out of all of the cows he purchased, he only sold 243, leaving 81
cattle unaccounted for.


 Northcutt assumed that there would be some “death loss” when he originally
purchased the cattle, but he had no idea what had happened to the other 81 cows. On October 14,
2001, he went to Walters’s farm and picked up the remaining cattle. He said that after he returned
from a vacation, Walters told him that he would have the rest of his cattle penned. However, when
he called Walters, he was told that he had picked up all of his cattle and that there were no more
cattle left. Northcutt knew Walters was wrong because he had records of how many cattle he had
picked up from Walters’s farm. Specifically, Northcutt said that Rex Womack had picked up 136
cows and 57 yearling calves. He also testified about buying 86 calves from Ricky Thompson and
26 calves from Lufkin Livestock. Northcutt further stated that these 112 calves were also delivered
to Walters’s farm. Fifty-seven calves were subsequently sold at Lufkin Livestock; therefore,
Northcutt claimed that he was 55 yearlings short. He understood that a two percent death loss would
be accurate, but he stated that he would “like to have the calves back that Walters stole” from him. 
            Northcutt said that he paid Walters $11,000.00 for medicine, baling, and “whatever expenses
had occurred at that time.” Although the agreement did not require Northcutt to “front” Walters’s
expenses, Northcutt gave him the money because “he said he needed that money and [he] wrote him
a check.” Northcutt also bought three head of cattle from Walters that Walters had previously
purchased from Lufkin Livestock because Northcutt “knew those cows and they were good cows,”
so he “wanted to keep them as mother cows.” 
            He testified that Walters had converted 81 cows and 55 yearlings. Northcutt further testified
that “as far as a rough figure” goes, the 81 cows would be worth $650 per head, or a total of
$52,650.00. He also said that the 55 yearlings were worth $350 per head, or $19,250.00. The total
amount Northcutt sought for damages was $71,900.00, plus interest and attorney’s fees. He also
sought $100,000.00 in punitive damages because the cattle were “willfully converted.” 
            Clint Sorrels, one of Walters’s business partners, testified that he was present when Northcutt
delivered cattle to Walters’s farm and that Northcutt only delivered 300 cows and 15 to 17 bulls. 
According to Sorrels, 15 of those cows died, and 75 yearlings were also placed on the farm. He
helped round up all of Northcutt’s cattle and stated that whenever Northcutt picked up the last batch
of cattle, no more of his cattle remained on the property. He stated that Walters did not sell any of
Northcutt’s cattle to anyone else. 
Analysis
            To recover for conversion, a plaintiff must prove that (1) the plaintiff owned, possessed, or
had the right of immediate possession of the property, (2) the property was personal property, (3) the
defendant wrongfully exercised dominion or control over the property, and (4) the plaintiff suffered
injury. See Green Int'l, Inc. v. Solis, 951 S.W.2d 384, 391 (Tex. 1997); United Mobile Networks,
L.P. v. Deaton, 939 S.W.2d 146, 147-48 (Tex. 1997). 
            Northcutt offered evidence at trial to demonstrate that 1) he owned all of the 324 cattle
originally purchased, 2) the cattle were his personal property,


 3) Walters wrongfully exercised
dominion or control over the 81 cows and 55 yearlings, and 4) Northcutt was not paid for these cattle
and therefore suffered injury. Accordingly, we hold that Northcutt adduced legally sufficient
evidence to prevail on his claim for conversion of the cattle. However, there was no evidence in the
record to support the trial court’s finding that four bulls were converted. Northcutt only testified that
81 cows and 55 yearlings were converted; therefore, we sustain Walters’s third issue as it pertains
to the finding that four bulls were converted.
            With regard to the factual sufficiency of the evidence, Walters and Sorrels testified that
Northcutt picked up all of the cattle that he had brought to Walters’s farm. Northcutt and Virgil
Roberts testified that when they went to pick up all of the cattle, Walters acknowledged that there
were cattle remaining and that 81 cows and 55 yearlings were unaccounted for. Although Walters
did adduce evidence to the contrary, we hold that the trial court’s finding that a conversion had
occurred was not so against the overwhelming weight of the evidence as to be manifestly unjust and
clearly wrong. Walters’s third issue, as it pertains to the factual sufficiency of the evidence to
support the finding that 81 cows and 55 yearlings were converted, is overruled. The issue is
sustained regarding the factual sufficiency of the evidence to support the finding that four bulls were
converted.
 
Legal Sufficiency of the Fair Market Value of the Cattle
            In his final issue, Walters argues that the evidence supporting the trial court’s conclusion of
law that the fair market value of the cattle as $65,900.00 was legally insufficient.


 Northcutt
contends that the trial court properly found the fair market value of the cattle.
Applicable Law
            If the plaintiff in a conversion action elects to recover the value of the property, actual
damages are determined by the fair market value at the place and time of conversion. Deaton, 939
S.W.2d at 147-48. "Fair market value" has been historically defined as "the price which the property
would bring when it is offered for sale by one who desires, but is not obliged to sell, and is bought
by one who is under no necessity of buying it." City of Austin v. Cannizzo, 153 Tex. 324, 267
S.W.2d 808, 815 (Tex. 1954). 
            To review the evidence under a no-evidence point, we consider all the evidence in the light
most favorable to the prevailing party, including every reasonable inference in that party's favor. 
Associated Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 285-86 (Tex. 1998). We will
uphold the finding if more than a scintilla of evidence supports it. Burroughs Wellcome Co. v.
Crye, 907 S.W.3d 497, 499 (Tex. 1995). We must be persuaded that reasonable minds could differ
about the fact determination to be made by the fact finder. See id.
Analysis 
            The trial court’s finding stated that 
 
[t]he Court had no means to calculate nor was evidence presented from which a determination could
be made about the number of calves born to cows during the applicable time period and their value,
if any. Thus, no value was added for the converted calves, if any. After deduction of allowable
expenses of [Walters] (not including the asserted .50 per head per day for grazing which the Court
found was not part of the agreement) the gross profit is $56,691.54. One half of the profit is
$28,345.77. Accordingly, [Northcutt] was awarded $28,345.77 plus prejudgement [sic] and post
judgment interest. 


            Northcutt, an owner of the Lufkin Livestock exchange, testified that “as far as a rough figure”
goes, the value of the cows was $52,650.00 ($650 per head times 81 cows) and the value of the
yearlings was $19,250.00 ($350 per head times 55 yearlings). Therefore, according to Northcutt, the
“rough figure” value of all of the cattle converted was $71,900.00. However, this method of
valuation is inconsistent with the proper method of placing a value on converted property. As
previously stated, the measure of damages in a conversion case is the fair market value of the
property at the place and time of the conversion. See Deaton, 939 S.W.2d at 147-48. Based on the
record, the conversion occurred at some point in time between June of 2000 and October of 2001. 
No evidence was offered to prove the fair market value of the cattle at any time between those dates
at Cayuga, Anderson County, Texas. Accordingly, Northcutt’s general “rough figure” of the value
of the cattle amounts to no evidence of the fair market value of the cattle at the time and place of the
conversion. 
            Furthermore, we have thoroughly reviewed the record and are unable to determine how the
trial court reached the conclusion that the fair market value of the cattle was $65,900.00 and that the
gross profit was $56,691.54. The trial court apparently took into account some of Walters’s
“allowable expenses” to reach the “gross profit,” but we cannot find or determine any amount of
those “allowable expenses.” Accordingly, we sustain Walters’s fourth issue.
            Having sustained a no-evidence issue on a necessary element of Northcutt's conversion claim,
we would ordinarily render judgment against him. However, appellate courts have broad discretion
to remand for a new trial in the interest of justice where it appears that a party may have proceeded
under the wrong legal theory. See Tex. R. App. P. 43.3(b); see also Boyles v. Kerr, 855 S.W.2d 593,
603 (Tex.1993) (applying prior Texas Rule of Appellate Procedure 180 specifically allowing only
the Texas Supreme Court to remand in the interest of justice); Varel Mfg. Co. v. Acetylene Oxygen
Co., 990 S.W.2d 486, 500 (Tex. App.–Corpus Christi 1999, no pet.). In particular, we may remand
for new trial when damages were improperly calculated by the plaintiff and the interest of justice
requires that the plaintiff be given an opportunity to show the proper measure of his damages. See
id.; Williams v. Gaines, 943 S.W.2d 185, 193-94 (Tex. App.– Amarillo 1997, writ denied); A.B.F.
Freight Sys, Inc. v. Austrian Imp. Serv., Inc., 798 S.W.2d 606, 616 (Tex. App.–Dallas 1990, writ
denied). 
            In the present case, we conclude that justice would best be served by allowing Northcutt the
opportunity to present competent evidence of the fair market value of the cattle at the time and place
of the conversion. Moreover, because liability on the conversion claim was contested, we may not
order a new trial on damages alone, but must remand for a new trial on the conversion claim
generally. See Tex. R. App. P. 44.1(b). 
 
Conclusion
            None of the alleged procedural problems at trial require reversal. After a thorough review
of the record, however, we hold that the evidence is legally and factually insufficient to support the
trial court’s finding that Walters converted four of Northcutt’s bulls. We also hold that the record
is devoid of any evidence of the proper measure of damages for the converted cattle. Accordingly,
we reverse the judgment of the trial court and remand this cause for a new trial consistent with this
opinion.
 
                                                                                                    SAM GRIFFITH 
                                                                                                               Justice
 
 
Opinion delivered February 10, 2005.
Panel consisted of Worthen, C.J., Griffith, J., and DeVasto, J.







(PUBLISH)